**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| PLYMOUTH COUNTY, | ) **Civil Action No. 12-cv-10781** |
| Plaintiff, | ) Judge Nathaniel M. Gorton |
| vs. | ) |
| MERSCORP, INC., MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., BANK OF AMERICA, N.A., BAC HOME LOANS SERVICING LP, CITIBANK, N.A., CITIMORTGAGE, INC., GMAC MORTGAGE, LLC, JPMORGAN CHASE BANK, N.A., STATE STREET BANK AND TRUST CO., WELLS FARGO BANK, N.A. and DOE CORPORATIONS I-MMM, | ) |
| Defendants. | ) |

## [PROPOSED] CORRECTED COMPLAINT

1. Plymouth County brings this action to recover damages resulting from Defendants' unlawful scheme to avoid recording mortgage assignments with the Plymouth County Registry of Deeds, and paying the attendant recording fees, while benefiting from the priority of ownership established by recording.

2. Massachusetts law provides that there shall be a registry of deeds in each of the 21 registry districts, including Plymouth County. M.G.L.A. 36 § 1. A registry of deeds records every deed and instrument presented for recording in the district where the land to which such instrument relates is located.[1] M.G.L.A. 36 § 12.

---

[1] There are two different types of land in Massachusetts – registered and unregistered (also referred to as "registered land" and "recorded land"). Land registration is a separate system of recording documents, under which, the Massachusetts Land Court has jurisdiction to adjudicate and decree the status of title. The majority (approximately 80-85%) of land in Massachusetts is

3. Massachusetts' public recording laws serve two important public policies—to show the condition of title to a parcel of land, and to protect purchasers from conveyances that are not recorded and to which they have no notice. M.G.L.A. 183 § 4. Because recording is deemed to provide notice to subsequent purchasers that there is an encumbrance on the land, a conveyance is valid against only the grantor (and not subsequent purchasers without notice) unless it is recorded.

4. The Plymouth County Registry of Deeds ("Registry of Deeds") has been providing this service since 1685. In exchange for providing this public service, the Registry of Deeds charges fees for each document it records, as prescribed by statute. M.G.L.A. 262 § 38.

5. Defendants took it upon themselves to do away with this centuries-old public recording system and, for their own benefit and to the detriment of Plymouth County, created their own private recording system -- Mortgage Electronic Registration Systems, Inc. ("MERS").

6. MERS is an electronic database that tracks ownership interests and servicing rights in residential mortgages. MERS was created so that mortgage industry participants, including Defendants, could avoid the inconvenience and expense of recording with a registry of deeds each time a mortgage was transferred (i.e. sold or assigned).

7. Defendants used MERS to facilitate mortgage securitization, a financial practice that generally involves the transfer (i.e., assignment) of mortgages among Defendants and other financial institutions, which are eventually pooled into trusts that issue mortgage-backed securities for sale to investors. To securitize, mortgages are typically assigned at least three times.

---

unregistered (recorded) land. This action relates only to Defendants' failure to record assignments of unregistered land.

56353_v2                                            2

8. To expedite the securitization of mortgage loans, and avoid paying county recording fees for each assignment, Defendants began to record land instruments in the name of MERS, which they contended could act as their placeholder in county public records should they want to use public records to alter or foreclose on the mortgage. The loans were then registered electronically on the MERS system, which purported to track subsequent assignments. These subsequent assignments were not recorded with the Registry of Deeds.

9. By circumventing the Registry of Deeds, Defendants and others avoided the time it took to physically record each and every mortgage assignment with the Registry of Deeds -- and, most importantly, Defendants and others avoided paying the attendant recording fees. However, Defendants benefitted as if the assignments were recorded by retaining priority of ownership, which allowed them to transfer the mortgage loans into trusts that issued mortgage backed securities, garnering huge profits for Defendants.

## JURISDICTION AND VENUE

10. Plaintiff filed its original complaint on March 30, 2012 in Suffolk County Superior Court. Suffolk County Superior Court has both subject matter and personal jurisdiction over the parties and causes of action set forth in this Complaint pursuant to M.G.L.A. 212 § 4 and M.G.L.A. 223 § 6.

11. Defendants removed the action to this Court on May 1, 2012, alleging that this Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332.

12. This Court does not have subject matter jurisdiction over this action because there is a lack of complete diversity among the parties. Plaintiff Plymouth County and Defendant State Street Bank and Trust Company are both citizens of Massachusetts.

13. This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts with Massachusetts so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## PARTIES

14. Plaintiff Plymouth County is an incorporated subdivision of the Commonwealth of Massachusetts. The Registry of Deeds collects fees for providing recording services and pays those fees to the Plymouth County Treasurer, which collects and manages all money belonging to Plymouth County. M.G.L.A. 36 § 39. The damages claimed herein belong to Plymouth County, which is the real party in interest. Plymouth County is authorized to sue pursuant to M.G.L.A. 34 § 1.

15. Defendant MERSCORP, Inc. ("MERSCORP") is a Delaware corporation with its principal place of business in Vienna, Virginia. MERSCORP owns and operates the MERS System, which is a national registry that tracks ownership and servicing rights in residential mortgage loans, including residential mortgage loans secured by real property located in Plymouth County.

16. Defendant MERS is a Delaware corporation with its principal place of business in Reston, Virginia. MERS is a wholly owned subsidiary of MERSCORP, and regularly conducts business in Plymouth County.

17. Defendant JPMorgan Chase Bank, N.A. ("Chase"), individually, and as successor by merger to Chase Home Finance, LLC, is a national banking association with its principal place of business in Columbus, Ohio. As described below, Chase, either directly and/or indirectly through its agents, employees, subsidiaries and/or related companies, including without limitation Chase Home Finance LLC, Chase Home Finance Inc., Chase Home Mortgage Corp, Chase Manhattan Mortgage Corporation, Chase Mortgage Services Inc., WaMu Bank,

WaMu Capital, WaMu Securities, WaMu Acceptance, Bank One Corporation, EMC Mortgage LLC, and EMC Mortgage Corporation, engaged in transactions related to the securitization of mortgage loans of real property located within Plymouth County.

18.     Defendant Bank of America, N.A. ("Bank of America"), individually, and as successor by merger to LaSalle Bank National Association, is a national banking association with its principal place of business in Charlotte, North Carolina.  As described below, Bank of America, either directly and/or indirectly through its agents, employees, subsidiaries and/or related companies, including without limitation BAC Home Loans Servicing LP (f/k/a Countrywide Home Loans Servicing, LP), BAC GP, LLC (f/k/a Countrywide GP, Inc., and Countywide GP LLC.), engaged in transactions related to the securitization of mortgage loans of real property located within Plymouth County.

19.     Defendant CitiMortgage, Inc. ("CitiMortgage") is a New York corporation with its principal place of business in O'Fallon, Missouri.  As described below, CitiMortgage, either directly and/or indirectly through its agents, employees, subsidiaries and/or related companies, including without limitation Citibank, N.A., Citi Residential Lending, Inc., Citicorp Acceptance Company, Inc., CitiFinancial, Inc., CitiFinancial Mortgage Company, Inc., Citigroup Mortgage Loan Trust, Inc., Principal Residential Mortgage, Inc., and Wholesale Mortgage, Inc., engaged in transactions related to the securitization of mortgage loans of real property located within the Plymouth County.

20.     Defendant GMAC Mortgage LLC ("GMAC"), a limited liability company whose sole ultimate member is Ally Financial, Inc., is a Delaware corporation with its principal place of business in Detroit, Michigan. As described below, GMAC, either directly and/or indirectly through its agents, employees, subsidiaries and/or related companies, including without

limitation GMAC Bank, GMAC Commercial Mortgage Corporation, GMAC Relocation Services, Inc., GMAC LLC, and GMAC Mortgage Corporation, engaged in transactions related to the securitization of mortgage loans of real property located within Plymouth County.

21. Defendant State Street Bank and Trust Company ("State Street") is a trust company organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts. As described below, State Street, either directly and/or indirectly through its agents, employees, subsidiaries and/or related companies, engaged in transactions related to the securitization of mortgage loans of real property located within Plymouth County.[2]

22. Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), individually, and as successor by merger to Norwest Bank, N.A., and Wells Fargo Bank of Minnesota, N.A. is a national banking association with its principal place of business in Sioux Falls, South Dakota. As described below, Wells Fargo, either directly and/or indirectly through its agents, employees, subsidiaries and/or related companies, including without limitation Wells Fargo Funding Home Equity, Wells Fargo Home Mortgage, Inc., Wells Fargo America, Inc., and America's Outsource Mortgage Program, engaged in transactions related to the securitization of mortgage loans of real property located within Plymouth County.

23. The true names and capacities of Defendants Doe Corporations I – MMM are unknown to Plaintiff. Plaintiff believes that through discovery, the identity of Defendants Doe Corporations I – MMM will become known to Plaintiff.

---

[2] The original complaint incorrectly named State Street's parent company, State Street Corp., as a defendant. State Street Bank and Trust Company is the proper party to this action, and Plaintiff dismisses the claims asserted against State Street Corp. in the original complaint.

# FACTUAL STATEMENT

### A. Massachusetts' Public Recording System

24. To finance the purchase of real property, a borrower typically receives a loan, often in the form of a mortgage[3], from an originating lender. A "mortgage" is a land instrument comprised of two separate documents: (1) a promissory note, which establishes the borrower's obligation to repay the loan, and (2) the mortgage itself, which gives the lender a security interest in the borrower's property to secure repayment of the loan.

25. Persons possessing an interest in real property in Massachusetts may record their interest in the registry of deeds in the district in which the real property is located. Recording one's interest in real property provides notice to, and protects that interest against, subsequent purchasers. Indeed, Massachusetts law provides that a conveyance of real property shall not be valid against any person except the grantor unless it is recorded in the registry of deeds. M.G.L.A. 183 § 4.

### B. The Mortgage Securitization Process

26. Beginning in the 1990s, mortgage-backed securitizations became increasingly popular. The process of securitizing mortgage loans began with lender banks, who would originate as many residential mortgage loans as possible for sale to various commercial and investments banks. Those financial institutions would, in turn, sell the mortgage loans amongst themselves and then pool them into trusts for eventual sale to investors as mortgage-backed securities ("MBS").

27. The securitization process involves mortgage loan sales that are evidenced in multiple contracts between the securitizing parties. The securitization contracts explicitly state

---

[3] Mortgages and deeds of trust are collectively referred to herein as "mortgages."

that the mortgage loans, which include the mortgage notes and mortgages, are sold, transferred, assigned, set over, deposited with and otherwise conveyed between the relevant parties.

28. A fundamental aspect of the mortgage securitization process is that the issuing trust for each offering must obtain good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the holders of the MBS to be legally entitled to enforce the mortgage loans in the event of default. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

29. In order to preserve the bankruptcy-remote status of the issuing trusts in MBS transactions, the notes and security instruments are generally not directly transferred from the mortgage loan originator to the trust. Rather, to securitize a mortgage, several assignments must be made.



**Securitizing a Mortgage Loan**

a. First, originating lenders sell mortgages (each of which includes both the promissory note and the mortgage documents) to an aggregator or sponsor. The sponsor is a special purpose entity that is often affiliated with a large financial institution or investment bank.

b. Second, the sponsor initiates the securitization by transferring (i.e., assigning) the mortgage to a depositor.

c. Third, the depositor then transfers the mortgage to a "special purpose vehicle" (usually a trust) to be held for the eventual sale to and subsequent benefit of investors. typical life of a securitized mortgage, therefore, entails *at least three* assignments.

30. Defendants profited during the housing bubble of the last decade by purchasing mortgages from loan originators and, as described above, securitizing the mortgage loans for sale to investors, thereby generating fees for the banks while moving the mortgage loans—and their inherent risk of default—off their books. The risk that the borrowers would default on the underlying mortgage loans was passed on to MBS investors.

31. Offering documents for a MBS typically represent in substance that the issuing trust for each respective offering had obtained good title to the mortgage loans comprising the

pool underlying the offering. MBS investors also relied on offering documents that made representations about the characteristics of the underlying loans, among other things.

32. When selling a portfolio of mortgage loans to a Depositor, the Sponsor typically represents that each mortgage loan is a "first lien" on the underlying property. A "first lien" is the first mortgage loan recorded with the county recorder's office for a given property and takes priority over later-recorded liens, including second mortgages.

33. Similarly, Depositors typically represent in the PSAs that each mortgage loan is subject to no prior liens.

34. Defendants were able to represent that the mortgage loans being sold to the trusts for purposes of securitization were first lien mortgages because the initial land instruments were recorded in registries of deeds designating MERS as a "mortgagee" or "nominee," as described in further detail below.

C. **Defendants Avoided the Centuries-Old Public Recording System by Creating and Using a New, Private Recording System—MERS**

35. MERS maintains a private computer system that was intended to permit its users to, among other things, register and track changes in ownership interests in mortgages.

36. Since 1997, over 65 million mortgages have been registered on MERS's system – three out of every five on the market. Currently, nearly 5,600 participating MERS members ("MERS Members" or "Members") track roughly 31 million active residential mortgage loans on the MERS system. MERS Members include a collection of banking and mortgage entities that ranges from local banks and investments banks to mortgage lenders and title insurers to approximately 3,000 mortgage servicers.

37. Members pay MERS membership fees to register and track mortgage ownership interests and servicing rights on MERS's system.

38. Members also pay MERS fees for each transaction conducted, such as assigning a mortgage to itself or to another MERS Member, identifying the mortgage's servicer, or using the MERS corporate seal.

39. MERS does not itself originate, assign, service or invest in mortgages.

40. Instead, MERS Members used (and continue to use) the "MERS" name to avoid recording in registries of deeds each time a mortgage ownership interest was assigned – thereby avoiding the payment of attendant county recording fees.

### 1. MERS Members Place MERS in Land Instruments

41. MERS Members typically record the initial land instrument, on which "MERS" is named, in registries of deeds in two different ways.

42. One way occurs when Members record an original mortgage on which "MERS" is designated in a myriad of ways: "MERS as mortgagee of record," "MERS as nominee," "MERS as beneficiary," and even "MERS (solely as nominee for Lender) as beneficiary." MERS and its Members use the term "MERS as Original Mortgagee (MOM)" to describe this type of mortgage.

43. The second way occurs when Members record a mortgage assignment on which "MERS" is named. On such mortgage assignments, Members often purport to assign the mortgage and underlying debt either to: (i) MERS itself; or (ii) MERS on behalf of another Member.

44. MERS, however, admits that it does not draft or execute land instruments on behalf of itself or its Members. Rather, MERS instructs its Members to self-certify their employees (e.g., employees of the lending banks and mortgage servicers) to become certified MERS "assistant secretaries" and "vice-presidents" so the Members' staff can appear as though

they work for MERS, even though they do not. To self-certify, Members' staff download certification forms directly off of MERS's website.

45. Once they self-certify, Members' staff draft and execute land instruments purporting to be "MERS assistant secretaries" and "MERS vice-presidents." Registries of deeds, therefore, accept and record what facially appear to be land instruments signed by "MERS" employees, even though the documents were actually prepared by Members' staff.

46. Further, MERS Members contend that, as long as mortgage ownership interests are assigned to other MERS members, they are not required to record each mortgage assignment in registries of deeds because MERS acts on behalf of both the assignor and assignee (representing both MERS Members simultaneously).

### 2.    MERS Members Failed to Record Mortgage Assignments

47. MERS was intended to improve the profitability of the primary and secondary mortgage market, and facilitate securitization of mortgages, through the rapid assignment of mortgages between financial institutions – while avoiding: (i) recording each time the mortgages are assigned in registries of deeds, and (ii) paying the attendant recording fees.

48. While admitting they do not record assignments in registries of deeds, MERS Members often fail to register mortgage assignments on MERS's private system as well.

49. Thus, MERS Members often only record a mortgage assignment (regardless of how many times the mortgage had been assigned prior) in registries of deeds when they are attempting to assign the mortgage from MERS. This generally occurs when MERS Members seek to initiate a terminating event (e.g., to foreclosure when the mortgage is in default, or to release when the mortgage is refinanced or satisfied).

### 3. Defendants Failed to Record All MERS and Non-MERS Mortgage Assignments While Retaining the Benefits of Recording

50.     As MERS members, Defendants would often assign mortgage loans between one another using MERS as a placeholder in land records once, and continue to receive priority of their ownership interests in that mortgage loan while failing to record subsequent assignments.

51.     However, Defendants also securitized non-MERS mortgage loans (i.e., non-MERS land instruments recorded in county land records) – without recording the mortgage assignments in the registries of deeds.

52.     Where the typical life of a securitized mortgage entails at least three assignments, Defendants' failure to record such mortgage assignments, while simultaneously reaping the benefits of recording, unjustly benefited Defendants.

## CAUSE OF ACTION

## Unjust Enrichment

53.     Plaintiff incorporates by reference Paragraphs 1 through 50 as though set forth fully herein.

54.     Defendants recorded or caused to be recorded initial assignments of mortgage loans in MERS's name, which conferred at least two distinct benefits upon Defendants.

55.     First, by recording this initial assignment, MERS Members took advantage of the benefit of priority conferred by M.G.L.A. 183 § 4.  Defendants retained this benefit even after subsequent assignments to other MERS Members, though these subsequent assignments were not recorded.  Therefore, Defendants received the benefits conferred by the recording statute without adhering to its requirements.

56.     Second, recording the initial assignment allowed them to represent to MBS investors that the underlying mortgage loans were "first lien" mortgages, which made the MBS

appear safer and more attractive to investors, which was the ultimate end-game for Defendants—i.e., to quickly and cheaply securitize mortgage loans and sell the MBS to investors. Defendants reaped substantial profits from securitizing mortgages and selling MBS to investors by representing that the mortgages were "first lien." In doing so, Defendants recorded assignments when it suited them (i.e. recording the initial land instrument) and used the MERS system when recording was inconvenient for them (i.e. failing to record mortgage assignments leading to securitization).

57. By their wrongful and improper conduct, Defendants were, and are, unjustly enriched at the expense of and to the detriment of Plaintiff for the recording fees that Defendants retained.

58. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff seeks restitution from Defendants and respectfully requests that this Court disgorge all profits, benefits, and other compensation Defendants obtained by their wrongful and improper conduct.

## PRAYER FOR RELIEF

WHEREFORE, by and through its undersigned counsel, Plaintiff prays for judgment declaring and determining that:

a. Plaintiff is entitled to restitution and disgorgement of Defendants' profits, benefits, and other compensation Defendants obtained by their wrongful and improper conduct;

b. Plaintiff is entitled to an award of damages as set forth above;

c. Plaintiff is entitled to an award of reasonable attorneys' fee and costs of bringing this action; and

d. Plaintiff is entitled to such other and further relief as the Court deems just and proper.

## JURY DEMAND

    Plaintiff demands a trial by jury.

Dated:  June 14, 2012                      Respectfully submitted,

                                               /s/ Christian Siebott_____
                                               Stanley D. Bernstein (Bernstein@bernlieb.com)
                                               Christian Siebott (Siebott@bernlieb.com)
                                               Jeffrey Lerner (Lerner@bernlieb.com)
                                               BERNSTEIN LIEBHARD LLP
                                               10 East 40th Street
                                               New York, New York 10016
                                               Telephone:  (212) 779-1414
                                               Facsimile:   (212) 779- 3218

                                               Robert T. Naumes (rnaumes@tenlaw.com)
                                               THORNTON & NAUMES, LLP
                                               100 Summer Street, 30th Floor
                                               Boston, Massachusetts 02110
                                               Telephone:  (888) 491-9726
                                               Facsimile:  (617) 720-2445

                                               *Counsel for Plaintiff Plymouth County*